# UNITED STATES COURT OF APPEALS
## For the Fifth Circuit

_____

No. 99-31235

_____

MISSISSIPPI RIVER BASIN ALLIANCE; NATIONAL WILDLIFE FEDERATION;
AMERICAN RIVERS; ARKANSAS WILDLIFE FEDERATION; MISSISSIPPI WILDLIFE
FEDERATION; SIERRA CLUB, THROUGH ITS DELTA AND MISSISSIPPI CHAPTERS;
and LOUISIANA WILDLIFE FEDERATION,
Plaintiffs-Appellants,

v.

JOSEPH W. WESTPHAL, ASSISTANT SECRETARY OF THE ARMY FOR CIVIL WORKS;
LT. GEN. JOE N. BALLARD, CHIEF OF ENGINEERS; MAJ. GEN. PHILLIP R.
ANDERSON, COMMANDER, MISSISSIPPI VALLEY DIVISION, U.S. ARMY CORPS OF
ENGINEERS; AND COL. ROBERT CREAR, COMMANDER, VICKSBURG DISTRICT, U.S.
ARMY CORPS OF ENGINEERS,
Defendants-Appellees,

and

BOARD OF MISSISSIPPI LEVEE COMMISSIONERS; BOARD OF LEVEE
COMMISSIONERS FOR THE YAZOO-MISSISSIPPI DELTA,
Intervenors-Appellees.

_____

Appeals from the United States District Court
for the Eastern District of Louisiana

_____

October 23, 2000


Before KING, Chief Judge, and REYNALDO G. GARZA, and PARKER, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:


## BACKGROUND


On October 2, 1996, a coalition of environmental and wildlife conservation groups

("Conservation Groups") filed suit seeking a declaratory judgment and injunctive relief to prevent the United States Army Corps of Engineers ("Corps") from proceeding with a flood control project known as the Mississippi River Mainline Levee Enlargement and Berm Construction Project ("Project"). The Project involves 1,610 miles of authorized levees and berms and associated seepage control measures along the Mississippi River, including the levees, all lands between the levees, the river, and 3,000 feet landside of the levees on both sides of the river. Completion of the project will require construction of 128 separate components or "work items" in seven states: 49 in Louisiana, 40 in Mississippi, 17 in Arkansas, 13 in Missouri, 6 in Illinois, 2 in Tennessee, and 1 in Kentucky. The Project, part of the Mississippi River and Tributaries Project which Congress mandated under the Mississippi River Flood Control Act of 1928, is estimated to require 33 years for completion.

The Project's Environmental Impact Statement was initiated in 1974 and finalized in April of 1976. The Conservation Groups challenged the Corps's decision to proceed with the Project, alleging that the action violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 3421-4379d, because the Corps neglected to prepare a Supplemental Environmental Impact Statement ("SEIS") on the Project in light of: (1) new information and new circumstances that had arisen over the past two decades and (2) changes that were made to the Project since the preparation of the original EIS.

Once the Complaint was filed, the Board of Mississippi Levee Commissioners and the Board of Levee Commissioners for the Yazoo–Mississippi Delta ("Levee Boards") moved for

leave to intervene as defendants, which the district court granted.[1] The Levee Groups, Corps and Conservation Groups entered into settlement negotiations. Those negotiations culminated in a Consent Decree that was entered by the district court on June 25, 1997. The Consent Decree obligated the Corps to prepare a SEIS on the Project that satisfied all of NEPA's requirements. In July 1998, after distributing a draft SEIS for public comment and receiving extensive comments and critiques from the Conservation Groups on the draft, the Corps issued the final impact statement for the Project, which was approximately 1,700 pages in length. The Conservation Groups re-submitted comments raising legal and factual concerns. On October 5, 1998, the Corps signed the Record of Decision for the Project, approving the plan recommended in the final SEIS.

The SEIS identifies and discusses four alternative plans. First, under the Nonstructural option, in the event of floods, the government would simply seek to reduce and reimburse for existing damages. Second, under the Landside Borrow choice, the levees would be raised, strengthened, maintained and protected from seepage through continuing construction, using earth obtained solely from the landside of the levee.[2] Third, under the Traditional Method, as in the Landside Borrow alternative, the levees' construction would be commenced, however, the building material would be obtained primarily from the riverside locations closest to the construction site. Fourth, under the Environmental Design or Avoid and Minimize plan, the

---

[1] The Levee Boards served as partners with the Corps in the Project, having acquired thousands of acres of riverside lands from which to supply the Corps with borrow material for the Project.

[2] The Conservation Groups argue that the Nonstructural and Landside Borrow alternatives were eliminated from consideration on the basis of preliminary screening and not evaluated in detail in the SEIS.

Corps would first obtain landside cropland for borrow material from willing sellers, but if such land were not reasonably available, riverside land could be used.

The Conservation Groups preferred the Landside Borrow alternative. The Corps selected, however, the Avoid and Minimize alternative as the plan to accomplish the objectives of the Project at an additional cost of 33 million dollars in order to reduce the impact to bottomland hardwoods. To obtain construction material for the levees and landside seepage berms, the Corps will use the soil from bottomland hardwood wetlands and other wetlands.[3]

According to the SEIS, the selected alternative method minimizes, to the maximum extent practicable, the impact of individual work items by requiring detailed surveys and subsurface information evaluations to reduce the effect on bottomland hardwood wetlands. The plan involves 7,328 acres of wetlands (3,691 acres of forested wetlands and 3,637 acres of farmed wetlands). There are 5,166 acres of affected bottomland hardwood wetlands. The SEIS recommends reforesting 5,863 acres of frequently flooded agricultural land not directly impacted by borrow excavation to mitigate wetland, terrestrial, and waterfowl resource impacts. The SEIS maintains that a net gain of over 6,700 acres of high quality riverside aquatic habitat will be created by constructing borrow pits. Three thousand acres of riverside borrow pits will be designed for drainage and reforestation of high quality bottomland hardwoods. The SEIS concludes that there will be a net increase in terrestrial, wetland, waterfowl, and aquatic resource values and that, when the proposed action is considered in conjunction with other activities, no cumulative negative environmental impact results on an ecosystem, landscape, or regional scale.

---

[3] The "borrow pits" that are left after the soil is excavated are an average size of eight feet deep over 100 to 200 acres. The riverside borrow lands in Mississippi were acquired for the specific purpose of fulfilling the Levee Boards' responsibilities to the Corps.

The Conservation Groups contend that potential mitigation lands were not identified in the SEIS and that, although the Record of Decision adopts the recommended number of mitigation acres, the Project destroys vast areas of wetlands where the levee or berms will actually be located and where soil will be dug up to be used as building material for the levees and landside seepage berms. The Conservation Groups allege that the bottomland hardwood wetlands are among the Nation's most important and most depleted, with some 80 percent of the original wetlands already having been lost. In addition, the Groups note that the wetlands support many wildlife species, help clean chemical pollutants from the river water, ease erosion from nearby farmlands, and recharge ground water supplies.

The Conservation Groups contend that the SEIS is misleading and inaccurate because it fails to provide sufficient information upon which the Corps could make a rational decision concerning the manner in which to proceed with the Project. The dispute is centered on the Corps's decisions regarding the location and source of the material that will be used to enlarge portions of the existing levee system. The Conservation Groups want the material to be obtained from the landside of the levees, but the Corps decided to extract it from the riverside of the levees.

The Corps maintains that it complied with the terms of the consent decree by producing a SEIS that: 1) included comments from other federal agencies; 2) was completed within 24 months of the date of the entry of the consent decree; 3) analyzed site specific techniques as an alternative to achieve project objectives; 4) analyzed direct, indirect, and cumulative impacts of the Project; and 5) analyzed mitigation.

On December 4, 1998, the Conservation Groups challenged the substantive adequacy of

the SEIS under the auspices of the Consent Decree. On September 8, 1999, the district court entered judgment denying the Conservation Groups' Motion to Enforce Consent Decree and for Summary Judgment and granting the Corps's and Intervenors' Motions for Summary Judgment. This appeal followed.

## ANALYSIS

A.      Standard of Review

Courts of Appeals review summary judgments *de novo*, applying the same standard as the district courts. Fed.R.Civ.P. 56. The moving party is entitled to judgment as a matter of law when the pleadings, answers to interrogatories, admissions and affidavits on file indicate no genuine issue as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). If the burden at trial rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case. *See id.*

This Court will consider the evidence in the light most favorable to the non-movant, yet the non-movant may not rely on mere allegations in the pleadings; rather, the non-movant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; Fed.R.Civ.P. 56(c).

This Court's role in reviewing the adequacy of the SEIS is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Section 706(2) provides that a reviewing court shall

"hold unlawful and set aside agency action, findings, and conclusions found to be -- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *Citizens for Mass Transit, Inc. v. Adams*, 630 F.2d 309, 313 (5th Cir. 1980). This Court has set forth three criteria for determining the adequacy of an EIS:

> (1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives; (2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

*See Isle of Hope Historical Ass'n, Inc. v. U.S. Army Corps of Engineers*, 646 F.2d 215, 220 (5th Cir. 1981). The SEIS must provide information to satisfy these criteria. *Id*. Furthermore, the conclusions upon which an SEIS is based must be supported by evidence in the administrative record. *See e.g., Sabine River Authority v. U.S. Dept. of Interior*, 951 F.2d 669, 678 (5th Cir. 1992), *cert. denied*, 506 U.S. 823 (1992).

This Court must not "substitute [its] judgment for that of the agency," *Ross v. Federal Highway Admin*., 162 F.3d 1046, 1050 (10th Cir. 1998), and it must "avoid placing extreme or unrealistic burdens on the compiling agency." *Isle of Hope Historical Assoc., Inc*., 646 F.2d at 220. Because the "analysis of the relevant documents requires a high level of technical expertise, [courts] must defer to the informed discretion of the responsible federal agencies." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377, 109 S.Ct. 1851, 1861 (1989) 104 L.Ed.2d 377 (internal quotation omitted).

NEPA was created to ensure that agencies will base decisions on detailed information regarding significant environmental impacts and that information will be available to a wide

variety of concerned public and private actors. *Morongo Band of Mission Indians v. Federal Aviation Administration*, 161 F.3d 569, 575 (9th Cir. 1998). NEPA "exists to ensure a process, not a result." *Id.* This Court is to follow the "rule of reason" and a "pragmatic standard which requires good faith objectivity but avoids 'fly specking.'" *Id*. (citing *Lathan v. Brineger*, 506 F2d 677, 693 (9th Cir. 1974)). Agencies must explore and evaluate all reasonable alternatives. 40 C.F.R. § 1502.14. The regulations of the Council on Environmental Quality ("CEQ") and the Corps, which are entitled to substantial deference, require federal agencies to prepare supplements if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

B.      SEIS

        1.        Cumulative Impacts Analysis

On appeal, the Conservation Groups argue that the SEIS prepared by the Corps violates NEPA because its cumulative impacts analysis, its mitigation analysis, and its alternatives analysis are fatally flawed.[4] First, the Groups contend that the cumulative impacts analysis does not appropriately consider the cumulative impacts of other ongoing, proposed, or reasonably foreseeable future projects, and improperly substitutes general statements about mitigation for the requirement to analyze cumulative impacts.[5] The Conservation Groups maintain that the cumulative impacts analysis is based on arbitrary conclusions directly contradicted by relevant

---

[4] The Conservation Groups do not challenge the district court's analysis and conclusions with regard to the Project's site specific or water quality impacts.

[5] The Conservation Groups allege that the administrative record reveals no analysis whatsoever of: (1) other Corps water resources projects in the Project area; (2) other Corps operations and maintenance activities on the Mississippi River; and (3) a multitude of private actions in the Project area.

evidence in the administrative record and that the Corps should not avoid an analysis of the cumulative impacts on the grounds that compensatory mitigation resolves the issue. According to the Conservation Groups, the SEIS analysis places the environmental impacts of the Project in a false light by painting a picture of an environmentally benign project, when nothing could be further from the truth.

The district court found that the decision of the agency was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the Corps considered the cumulative impacts of the Project, which it concluded would not be significant.[6] The district court noted that the Corps considered other proposed projects and made the information available to a larger audience. The district court also observed that there was no indication that the selected alternative Project plan would have any cumulative impact other than that addressed in the SEIS.

---

[6] To support its assertion, the district court quotes the SEIS:

Currently, there is a variety of proposed water resource projects (flood control and environmental restoration) in the Delta. Studies are being conducted to evaluate the direction and magnitude of environmental change associated with these proposed projects. However, these projects are being designed to avoid and minimize environmental impacts to the extent practicable, and where appropriate offset unavoidable impacts. . . .

The incremental impact of the proposed action, when added to former, present, and foreseeable future actions, results in a net gain in nationally significant habitat and environmental values in the study area. The proposed action would not improve or worsen any cumulative effects associated with the existing Mississippi River levees and other activities in the Lower Mississippi River Valley. Although the project may induce some sediment and nutrient retention, this retention would be small in scale and would not affect the hypoxia zone in the Gulf of Mexico. The environmental design and compensation features net an increase in terrestrial, wetland, waterfowl, and aquatic resource values such that no significant cumulative environmental impact results on an ecosystem, landscape, or regional scale when the proposed action is considered in conjunction with other activities.

Under the "arbitrary and capricious" standard of review, this Court must give the Corps's decision substantial deference. After an examination of the administrative record, we find that the Corps's cumulative impact analysis provided sufficiently rigorous identification and consideration of the cumulative impacts of ongoing, proposed, and reasonably foreseeable future action to allow appropriate public assessment of the Project in accordance with NEPA. The Corps's consideration of other projects' potential cumulative environmental impacts in the relevant geographical area fulfills NEPA's requirements.

2. Mitigation Analysis

The Conservation Groups claim that the SEIS does not provide sufficiently detailed analysis of the effectiveness of the proposed mitigation, disputing the Corps's assertion that the net and cumulative effect of the proposed work is zero because all unavoidable impacts of construction including the loss of wetland functions and values are being fully compensated through mitigation. The Groups contend that the administrative record does not support the SEIS's mitigation analysis and shows that mitigation efforts often fail for a number of reasons, including poor project design, inadequate monitoring, and a lack of adequate maintenance or remedial monitoring. Further, the Conservation Groups question whether the proposed mitigation will be implemented because the Corps already has a backlog of 27,249 acres of reforestation and mitigation in the district where another 5,200 acres of mitigation must occur for this Project. They contend that, if the mitigation is unsuccessful, the impact of the Project is much more adverse than the Corps concedes. Thus, they maintain that the SEIS does not satisfy NEPA.

The district court found that the Corps's SEIS fully complies with NEPA's mitigation requirements because it discusses the environmental impacts to terrestrial, wetland, waterfowl,

and aquatic resources for each of the five alternatives for the Project.  Under CEQ regulations, agencies must provide a discussion of actions that can be taken to mitigate adverse environmental impacts to guarantee that agencies have seriously contemplated the environmental consequences of proposed federal projects.  As the district court observes, citing *Robertson v. Methow Valley Citizens Council*, 109 S.Ct. 1835, 1847 (1989), there is "a fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other."

The Corps's mitigation analysis has produced a result that is not subject to reversal under an arbitrary and capricious standard of review.  The SEIS identifies the unavoidable impacts to terrestrial, wetland, and waterfowl resources and formulates alternative measures to compensate for those losses, including the acquisition of in-kind land for compensation.  The Conservation Groups make valid points in challenging the Corps's mitigation assumptions, arguing that the success of wetlands mitigation is questionable.[7]  However, the Corps has conducted a serious and thorough evaluation of environmental mitigation options for the Project to allow its analysis to fulfill NEPA's process-oriented requirements, and thus to survive the arbitrary and capricious standard of review.

3.    Alternatives Analysis

The Conservation Groups challenge the SEIS on the grounds that its alternatives analysis fails to adequately evaluate a wholly reasonable alternative and an appropriate range of

---

[7] The Conservation Groups point to documents in the administrative record pertaining to the success rate of mitigation, the pre-existing mitigation commitments, and the uncertainty of funding.

alternatives.  The Groups contend that the Corps did not rigorously evaluate the Landside Borrow alternative and violated NEPA in choosing the Avoid and Minimize method.  According to the Conservation Groups, the SEIS should not have abandoned the Landside Borrow alternative after only preliminary screening and is misleading because it abandons its stated priority for locating borrow areas in landside cropland and adopts landside borrowing as an option of last resort.  Furthermore, the Conservation Groups maintain that the range of alternatives considered was insufficient because each of the alternatives have the same end result.  *See State of California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (holding that an inadequate range of alternatives was considered where the end result of all eight alternatives was development of a substantial portion of wilderness).   Under NEPA, the SEIS should "rigorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14(a).  According to the Conservation Groups, the Corps did not evaluate all reasonable alternatives for the Project.

Stating that the Conservation Groups' argument amounts to nothing more than a disagreement with the alternative the Corps chose, the district court held that the analysis of Project alternatives in the SEIS was sufficient to satisfy NEP and the CEQ regulations.  The district court was satisfied with the reasons the Corps gave for rejecting the landside alternative after only preliminary screening: 1) the alternative is at odds with the Project's purpose of providing protection to valuable farmland and urban areas on the landside of the levees; 2) acquiring the valuable farmland would cost approximately 30% more than acquiring the frequently-flooded farmland on the riverside; 3) there were numerous objections to the alternative by Project sponsors and residents in the delta; and 4) the relative habitat values of the riverside borrow area are superior to the landside borrow areas because periodic flushing on the landside

will accumulate more agricultural pesticides and herbicides. Accordingly, the district court was persuaded that the Corps had rigorously evaluated all reasonable alternatives.

Our review of the record persuades us that the Corps has conducted a "rigorous" and "thorough" evaluation in this case. It rejected alternatives, even those that could be considered to be viable and reasonable alternatives, after an appropriate evaluation. That rejection was not arbitrary or capricious. Therefore, we affirm the district court's decision to grant summary judgment in favor of the defendants.

## CONCLUSION

Given the heightened deference that this Court must afford the Corps's decision to proceed with the Project under an "arbitrary and capricious" standard of review, we affirm the district court's finding that the SEIS's cumulative impacts, mitigation, and selected alternatives analysis satisfies NEPA's requirements. Accordingly, we affirm the denial of the Conservation Groups' Motion to Enforce Consent Decree and for Summary Judgment, and we affirm the grant of the Corps's and Intervenors's Motion for Summary Judgment.