**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 2, 2011

No. 10-20502

Lyle W. Cayce
Clerk

SIERRA CLUB; HOUSTON AUDUBON SOCIETY,

Plaintiffs – Appellants

v.

FEDERAL HIGHWAY ADMINISTRATION; DEPARTMENT OF
TRANSPORTATION; SECRETARY OF TRANSPORTATION; TEXAS
TRANSPORTATION COMMISSION; DEIDRE DELISI, in her official
capacity as Chair of the Texas Transportation Commission; JANICE W.
BROWN, in her official capacity as Division Administrator of the Federal
Highway Administration, Texas Division; JEFFREY F. PANIATI, in his
official capacity as Administrator of the Federal Highway Administration;
RAYMOND LAHOOD, in his official capacity as Secretary of Transportation
of the U.S. Department of Transportation,

Defendants – Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CV-692

Before KING, DAVIS, and GARZA, Circuit Judges.

PER CURIAM:[*]

Sierra Club and Houston Audubon Society brought this suit under the

National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, alleging that the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 10-20502

Federal Highway Administration and others failed to follow certain requirements when preparing the Final Environmental Impact Statement for Segment E of the Grand Parkway, a highway planned in northwest Houston. The district court concluded that the defendants had complied with the Act's requirements and entered summary judgment in their favor. We affirm.

## BACKGROUND

The Grand Parkway—Texas State Highway 99—was first proposed in 1961 and is a 180-mile highway encircling the greater Houston area. Planners split the highway into eleven lettered segments, Segment A through Segment I-2. This case involves Segment E in northwest Houston. As proposed, Segment E is approximately 15 miles long and will connect I-10 near Katy, Texas with US 290 northwest of Houston. Segment E is designed as a four-lane controlled access toll road with intermittent frontage roads, all to be located within a 400-foot right-of-way.

The Texas Department of Transportation ("TxDOT") and the Federal Highway Administration ("FHWA") first filed a Notice of Intent to build Segment E in 1993 and began preparing an Environmental Impact Statement ("EIS"). Following public meetings in 1993 and 2000, FHWA and TxDOT published a draft EIS in February 2003. After a public hearing on the draft EIS, FHWA and TxDOT issued a Final Environmental Impact Statement (the "FEIS") in November 2007, and FHWA issue a Record of Decision ("ROD") approving the construction of Segment E on June 24, 2008.

Sierra Club filed the instant suit on March 9, 2009, against TxDOT, FHWA, the United States Department of Transportation, and various individuals in their official capacities (collectively, the "Agencies"). In its complaint, Sierra Club contended that the Agencies violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, in preparing the FEIS. Specifically, Sierra Club alleged that the FEIS inadequately analyzed the

No. 10-20502

following: (1) the alternatives to construction of Segment E; (2) the impacts on floodplains; (3) the impacts on wetlands; (4) the impacts on air quality; (5) the noise impacts; and (6) the indirect and cumulative impacts.

In June 2009, the Agencies prepared a re-evaluation of the FEIS (the "Re-evaluation") to address a design revision for Segment E. The Re-evaluation also considered whether a supplemental EIS was necessary based on the design revision and other new information, including changes to the floodplain map for the area. The Re-evaluation concluded that a supplemental EIS was unnecessary. The FHWA then issued a Revised Record of Decision ("Revised ROD") in which it re-affirmed its selected alternative route for Segment E.

In October 2009, Sierra Club sought to amend its complaint to add the Houston Audubon Society as an additional plaintiff and Harris County as an additional defendant. Sierra Club also sought to add five additional claims related to the Re-evaluation and the Revised ROD. The district court granted Sierra Club's motion to add Houston Audubon Society as a plaintiff, but denied the motion to amend in all other respects. The parties then cross-moved for summary judgment. In a thorough opinion, the district court concluded that the Agencies had not acted arbitrarily or capriciously in issuing the FEIS and ROD, and the court granted summary judgment to the Agencies on all claims. *Sierra Club v. Fed. Highway Admin.*, 715 F. Supp. 2d 721 (S.D. Tex. 2010). Sierra Club and Houston Audubon Society (collectively, "Appellants") appeal the district court's decision with regard to their first three claims against the Agencies and argue that the district court erred in denying leave to amend the complaint.

## DISCUSSION

### I.    NEPA CLAIMS

#### A.    Standard of Review

We review the district court's grant of summary judgment de novo, using the same standard as the district court. *La. Crawfish Producers Ass'n v. Rowan*,

463 F.3d 352, 356 (5th Cir. 2006).  Summary judgment is warranted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"NEPA-related decisions are accorded a considerable degree of deference," and "courts are to uphold the agency's decisions unless the decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Spiller v. White*, 352 F.3d 235, 240 (5th Cir. 2003) (quoting 5 U.S.C. § 706(2)(A)). "Under this highly deferential standard of review, a reviewing court has the least latitude in finding grounds for reversal."  *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 678 (5th Cir. 1992) (citation and internal quotation marks omitted).  We may not "substitute [our] judgment for that of the agency as to the environmental consequences of its actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).  Instead, we must assess whether the agency's decision is "within the bounds of reasoned decisionmaking," and determine whether the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).  The plaintiff bears the ultimate burden to prove that an agency's decision was arbitrary or capricious.  *See Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010).

**B.    NEPA Framework**

"NEPA imposes procedural requirements on federal agencies, requiring agencies to analyze the environmental impact of their proposals and actions." *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 224 (5th Cir. 2006); *see also Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000) ("NEPA was created to ensure that agencies will base decisions on detailed information regarding significant environmental impacts and that information will be available to a wide variety of concerned public and private actors.").

No. 10-20502

NEPA is a strictly procedural statute and does not mandate that the agency reach any particular conclusion. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("NEPA itself does not mandate particular results, but simply prescribes the necessary process."). NEPA ensures that agencies will engage in an environmentally-conscious process, not that they will reach the most environmentally-friendly result. *Id.* ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."); *Sabine River Auth.*, 951 F.2d at 676 ("NEPA does not prohibit the undertaking of federal projects patently destructive of the environment; it simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences.").

NEPA directs federal agencies to prepare an EIS when they engage in "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must include:

(i)    the environmental impact of the proposed action,
(ii)   any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii)  alternatives to the proposed action,
(iv)   the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v)    any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.* "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences . . . ." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227 (1980). We have set forth three criteria for reviewing the adequacy of an environmental impact statement:

5

(1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives;

(2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and

(3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

*Westphal*, 230 F.3d at 174. In addition, "the conclusions upon which an [EIS] is based must be supported by the evidence in the administrative record." *Id.* at 174–75.

## C.   Failure to Adequately Consider Alternatives

Appellants first argue that the Agencies failed to sufficiently consider alternatives to Segment E. To satisfy NEPA's requirement to provide an analysis of alternatives to the project, agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). "The rejection of even viable and reasonable alternatives, after an appropriate evaluation, is not arbitrary and capricious." *City of Dallas v. Hall*, 562 F.3d 712, 718 (5th Cir. 2009).

The FEIS considered two major alternatives, a No-Build and a Build alternative. Under the No-Build alternative, the FEIS considered no-build options such as high-occupancy vehicle lanes, bus transit, and rail transit. Under the Build alternative, the FEIS first considered several potential corridors for Segment E. Once the preferred corridor was identified, the FEIS considered the environmental impact of several alternate alignments within the preferred corridor. The FEIS ultimately concluded that a hybrid of two of the proposed alignments would satisfy the project objectives while minimizing the environmental impact of Segment E.

No. 10-20502

Appellants argue that the FEIS's analysis of alternatives fails to comply with NEPA for two reasons: (1) the FEIS's stated purpose and need for the project is so narrow that it foreclosed consideration of alternatives other than the construction of Segment E; (2) the analysis was so deficient in some areas that the deficiency prevented a thorough consideration of alternatives.

1.     *Purpose and Need Statement*

Appellants contend that the Agencies drafted the purposes and needs for the project too narrowly, which foreclosed the Agencies from fully considering the No-Build alternative.  Under NEPA, "agencies must look hard at the factors relevant to the definition of purpose." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).  "[A]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." *Id.* (citation omitted).  "Nor may an agency frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish those goals and the project would collapse under the weight of the possibilities." *Id.*  An agency may prefer one alternative from the outset, but must "proceed[] to perform its environmental tasks with . . . good faith objectivity." *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of the U.S. Army*, 492 F.2d 1123, 1129 (5th Cir. 1974) (citation and internal quotation marks omitted).

The FEIS identifies four objectives in its purpose and need statement:  (1) system linkage; (2) expanded capacity; (3) increased safety; and (4) economic development.  Appellants claim that these objectives are too narrow because the No-Build alternative could not possibly satisfy them, and therefore the Agencies did not fully consider the No-Build alternative.  We disagree.  The FEIS fully considered several options under the No-Build alternative, and it assessed whether each of those options would satisfy the purposes of the project.

7

No. 10-20502

Appellants rely on *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997), to demonstrate that the purpose and need statement in the FEIS was too narrow. In *Simmons*, the Seventh Circuit held that the U.S. Army Corps of Engineers had crafted a needs statement too narrowly when drafting the EIS for a reservoir project that would serve two water systems because the statement precluded consideration of any alternative that would use more than one source to supply water to both systems. *Id.* at 670 ("By focusing on the single-source idea, the Corps never looked at an entire category of reasonable alternatives . . . ."). In contrast to the stated purpose in *Simmons*, the purpose and need statement in the FEIS at issue here did not foreclose consideration of any reasonable alternatives. In fact, the Agencies thoroughly considered the possibility of not building Segment E. They also fully considered various alternative locations for the new highway, ultimately choosing one of the options with the least environmental impact. The purpose and need statement was therefore not so narrow that it foreclosed consideration of reasonable alternatives.

2.    *Adequacy of Alternatives Analysis*

Appellants argue that the FEIS was deficient in its analysis of traffic congestion, traffic safety, and induced growth, which hampered full consideration of the No-Build alternative. With respect to traffic congestion and safety, Appellants' contentions lack merit. Appellants do not challenge the accuracy of the data in the FEIS. *See Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 964 (9th Cir. 2005) ("To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data in an EIS."). Instead, they challenge the Agencies' decision to approve the construction of Segment E, arguing that the data in the FEIS does not support such a decision. Appellants assert that the data in the FEIS suggest that Segment E will not improve traffic congestion or safety, particularly given that

8

No. 10-20502

an initiative called "Smart Streets" will improve both congestion and safety for the other roads in the area.

As the district court recognized, the FEIS does indeed indicate "only a modest improvement" in traffic congestion and safety, which "calls into question the wisdom of building an expensive and environmentally disruptive road . . . ." *Sierra Club*, 715 F. Supp. 2d at 734. However, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351. Although some of the statements in the FEIS may be viewed as overstated or hyperbolic because they suggest that traffic congestion will become unbearable in the coming years, these exaggerated statements do not amount to a violation of NEPA. The FEIS provides sufficient and accurate data regarding traffic congestion and safety, and it thoroughly explains how the Agencies reached their conclusions from the data provided. This satisfies NEPA's requirements.

Appellants next argue that the FEIS's analysis of "induced growth" is deficient. An EIS must include an assessment of indirect or secondary effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8. Development induced by the construction of a new highway is a secondary effect that must be considered in the EIS for the proposed highway.

Appellants challenge the methodology the Agencies used to determine the amount and nature of growth that would be induced by Segment E. To assess the development that would be induced by Segment E, the Agencies convened a panel of twenty-eight "knowledgeable members of the Houston community with first hand experience in planning or development in the government, education, and private sectors." (AR009213). A guidance document in the administrative record states that such panels are one of several acceptable methods for calculating induced growth, (AR008342–3), and Appellants articulate no other reasons why the methodology in the FEIS is flawed.

9

No. 10-20502

Appellants also challenge the data produced by the panelists, arguing that it does not include the 11,500-acre Bridgeland development planned for the Segment E project area. The draft EIS states that "[b]oth existing and proposed development were removed from the panel's realm of consideration . . . ." (AR009215), but the FEIS states that the panel determined that "planned developments would continue as planned." (AR018032). The FEIS also states that the panel contacted various developers in the project area "to determine location, percent build-out (as of September 2006), proposed build-out date, and approximate total number of structures proposed in each subdivision currently under construction or proposed within the study area." (AR018073). One statement in the draft EIS is in conflict with statements in the FEIS that speak to a later date. The later statements clearly indicate to us that the panel did consider the proposed Bridgeland development in the FEIS. Apart from this feeble attempt, Appellants fail to articulate how the calculations regarding induced growth in the FEIS are deficient or inaccurate. We are therefore satisfied that the Agencies took full account of the induced development when analyzing the environmental impacts of Segment E and complied with NEPA's requirement to examine the indirect consequences of the proposed action.

The purpose and need statement in the FEIS, as well as the data and analysis regarding traffic congestion, traffic safety, and induced development, was sufficient to permit the Agencies to consider reasonable alternatives to Segment E and to make a reasoned choice among the considered alternatives.

**D.    Reliance on Inaccurate Floodplain Data**

Appellants contend that the Agencies failed to comply with NEPA because the FEIS relies on inaccurate and outdated floodplain data for the area in which the alternative routes for Segment E were considered. In calculating the area of floodplain that would be impacted by Segment E, the FEIS used a Digital Flood Insurance Rate Map ("DFIRM") developed by the Federal Emergency

10

Management Agency ("FEMA") for the National Flood Insurance Program ("NFIP"). The DFIRM used in the FEIS floodplain analysis was approved in January 2007 for use beginning in June 2007. The DFIRM was the product of a study that revealed the prior flood elevations were too low. Shortly after the DFIRM was released, in February 2007, the Sierra Club sued FEMA, alleging that the DFIRM underestimated the flood elevation by approximately four feet. On August 19, 2008, the Harris County Commissioner's Court adopted a new map prepared by the Harris County Flood Control District and submitted it to FEMA for approval. The Agencies considered Harris County's new floodplain map in the Re-evaluation, and concluded that a supplemental EIS was unnecessary because the additional floodplain encroachment under the new map was small, and because "[t]he 100-yr floodplain acreage was not the primary reason for the selection of a preferred corridor." (AR023736). Appellants argue that the FEIS should have disclosed that the DFIRM it used to analyze the floodplain acreage was contested and could potentially be revised.

The district court held that the analysis of the floodplain issues for Segment E satisfied NEPA's requirements. The court reasoned that the Agencies reasonably relied on the floodplain maps issued in 2007, and that the Agencies had adequately responded to the 2008 revisions in the Re-evaluation. The court also noted that the additional floodplain acreage encroached on by the project under Harris County's new map "is not a substantial increase from what was reported in the FEIS." *Sierra Club*, 715 F. Supp. 2d at 736. We agree.

The FEIS's floodplain analysis satisfies the requirements of NEPA. The FEIS clearly explained that it relied on the DFIRM that was effective as of June 18, 2007. Furthermore, as the FEIS noted, FHWA regulations require the FHWA to use an NFIP map (which the DFIRM was) to determine whether a highway project will encroach on a floodplain. *See* 23 C.F.R. § 650.111(a). Perhaps the FEIS could have disclosed that the DFIRM was the subject of an

ongoing legal challenge and possibly subject to revision, but we do not find the Agencies' reliance on the official DFIRM to be arbitrary and capricious.

Appellants rely on two Ninth Circuit cases for their argument that the Agencies impermissibly relied on outdated and inaccurate floodplain data, and that the Agencies had a duty to disclose the inaccuracies in the FEIS. *See Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953 (9th Cir. 2005); *Seattle Audubon Society v. Espy*, 998 F.2d 699 (9th Cir. 1993). Both cases are distinguishable from this case. In *Native Ecosystems Council*, the EIS failed to disclose how the Forest Service had calculated the range for an elk herd, and the court criticized the Forest Service's "contradictory calculations" and the "opaque nature of the record." 418 F.3d at 964. The Ninth Circuit held that the Forest Service had violated NEPA's requirements by using an inaccurate calculation and failing to disclose the shortcomings of the calculation. *Id.* at 964–5. In *Seattle Audubon Society*, the Ninth Circuit held that the Forest Service violated NEPA's requirements by failing to supplement the EIS for its spotted owl management plan when a study released shortly thereafter revealed that the EIS may have relied on inaccurate data. 998 F.2d at 704. The Ninth Circuit reasoned that the Forest Service was required to acknowledge the opposing views and explain why further study was unnecessary or infeasible. *Id.* (citing 40 C.F.R. § 1502.9(b)).

In contrast to the EIS at issue in *Native Ecosystems Council*, the FEIS in this case clearly disclosed which floodplain map it had relied on for its analysis. The calculations were clear and straightforward and provided sufficient detail to allow those who did not participate in the preparation of the FEIS to understand how the FEIS arrived at the calculated number of floodplain acres encroached on by Segment E. And in contrast to *Seattle Audubon Society*, the Agencies disclosed the inaccuracies in the floodplain map in the Re-evaluation.

In any event, the Agencies updated the floodplain analysis in the Re-evaluation submitted in June 2009. As the district court noted, the updated analysis in the Re-evaluation shows that the updated maps resulted in an increase of 0.4 acres of floodway and 7.8 acres of floodplain that would be encroached upon by Segment E under the preferred alignment. The Agencies stated in the Re-evaluation that this slight increase in floodplain encroachment "would not change the reasons for the selection of a preferred corridor." (AR023737). Ultimately, the Agencies concluded that "there have been no significant changes to the assessed areas" and that a new EIS was unnecessary. (AR023751). Appellants cite a report they submitted to the district court stating that the new map "shows significant increases in flood levels and the floodplain study area for this project." Considering the detailed calculations in the Re-evaluation, this broad statement is insufficient for us to conclude that the Agencies' decision not to prepare a supplemental EIS was arbitrary and capricious. We are therefore satisfied that the Agencies took the requisite "hard look" at the floodplain issues in the EIS, and in the Re-evaluation after the floodplain map was revised.

Appellants also contend that the FEIS failed to consider an alternative of bridging of all floodplains. This is incorrect. The FEIS indicates that "[t]he preferred alternative alignment would bridge all of the regulatory floodways it crosses, and final design will include further consideration of bridging 100-year floodplains." (AR018521). The FEIS also states that "bridging of some floodplains . . . will likely be incorporated to the Preferred Alternative Alignment during final design, thus further reducing the impact to the region's floodplains." (AR018522). Bridging the floodplains, in addition to the floodways, is a mitigatory action. NEPA requires that agencies evaluate mitigation options, but it does not require that a full mitigation plan be formulated in the FEIS. *Westphal*, 230 F.3d at 177. The FEIS therefore satisfied NEPA's requirement

to *consider* options to mitigate Segment E's encroachment on the floodways and floodplains.

### E.    Inadequate Wetlands Analysis

Appellants argue that the analysis of the wetlands impacted by Segment E in the FEIS is inadequate for several reasons.  First, they argue that the FEIS does not sufficiently address the mitigation steps for wetlands impacted by Segment E.  We agree with the district court's holding that the mitigation analysis in the FEIS was sufficient.  "NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act; NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 528 (9th Cir. 1994); *see also Robertson*, 490 U.S. at 353 ("[I]t would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.").  Although "[a] mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA," *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (citation and internal quotation marks omitted), the FEIS at issue here does more than simply list the possible mitigation measures.  The FEIS details the measures, both on-site and off-site, that would be considered in the final mitigation plan and identified the agencies that "will be involved in decisions regarding appropriate mitigation ratios and the location, size, and character of the mitigation." (AR018500). The FEIS also indicates that a full mitigation plan will be formulated before construction, and that such a plan is a condition of the final permit for the project.[1]  (AR018500).

---

[1] Appellants also argue, somewhat contradictorily, that "the FEIS throws in almost every type of mitigation measure available."  That Appellants would suggest that the FEIS

No. 10-20502

Second, Appellants argue that the Agencies' failure to address the inadequacies of the floodplain maps resulted in inaccurate data for the wetlands analysis in the FEIS.  This contention lacks merit.  The FEIS plainly states that the acreage of wetlands affected by Segment E was calculated by using "field investigations and aerial photo interpretation." (AR018390).  The FEIS contains no indication that the wetlands analysis was tied to the floodplain maps.  Indeed, the Re-evaluation concludes that the updated floodplain maps did not affect the wetlands analysis and that "the ROD analysis remains valid." (AR023735).  Appellants point to no other information to suggest that the FEIS contains inaccurate data for the wetlands analysis.

Third, Appellants argue that the FEIS fails to consider the indirect impact on the wetlands from development induced by Segment E.  On the contrary, the FEIS considers the acreage of wetlands that could be impacted through development following construction of Segment E and concludes that Segment E "could indirectly impact 823 acres of wetlands above that expected for the No-Build Alternative."  (AR018068).  Moreover, the FEIS states that any "[d]evelopment and subsequent impacts of any aquatic resource at any location would require coordination with the [U.S. Army Corps of Engineers] and other permitting agencies." (AR018504). Thus, the FEIS clearly considers the indirect impact on the wetlands.

Finally, Appellants contend that the FEIS fails to consider bridging all of the wetlands as an alternative.  The FEIS states that the preliminary design for Segment E "includes bridging stream crossings with portions of the wetlands and riparian forest" and that "[f]urther minimization of impact through bridging would be considered during final design."  (AR018500).  As the district court noted, "the FEIS is concerned primarily with whether and where to build

---

contains *too many* mitigation options further convinces us that the Agencies fully considered the ways in which they could mitigate the environmentally destructive effects of Segment E.

Segment E, and leaves most design considerations for later approval in conjunction with other agencies." *Sierra Club*, 715 F. Supp. 2d at 739. The Agencies satisfied NEPA's requirements by considering the bridging of all wetlands as a mitigation strategy, and it was appropriate for the Agencies to leave the final bridge design out of the FEIS.

Having reviewed the FEIS and the administrative record, and having considered Appellants' various challenges to the FEIS, we hold that the Agencies complied with NEPA's requirements.[2]

## II.    LEAVE TO AMEND

Appellants argue that the district court erred when it denied the Sierra Club leave to amend its complaint. Sierra Club's original complaint contained six claims, all related to the alleged inadequacy of the FEIS. On October 15, 2009, Sierra Club sought to amend its complaint to add the Houston Audubon Society as an additional plaintiff and Harris County as an additional defendant. Sierra Club also sought to add five additional claims related to the Re-evaluation and Revised ROD. The Agencies opposed the addition of Harris County as a defendant on the basis that Harris County had not participated in the preparation of the FEIS or Re-evaluation. The Agencies also asserted that three of Sierra Club's additional claims were repetitive of claims brought in the original complaint, and that the two new claims could have been brought in the original complaint. The district court granted Sierra Club's motion to add Houston Audubon Society as a plaintiff and denied Sierra Club's motion to amend in all other respects, but the court did not provide reasons for its decision.

---

[2] Appellants also refer to Executive Order No. 11,988, 42 Fed. Reg. 26,951 (May 24, 1977), and Executive Order No. 11,990, 42 Fed. Reg. 26961 (May 24, 1977), which require federal agencies to find that siting a project in a floodplain or in wetlands is "the only practicable alternative." We do not construe Appellants' bare references to the Executive Orders as a claim that the Agencies incorrectly determined that the only practicable alternative for Segment E was encroaching on some portion of floodplains and wetlands.

No. 10-20502

We review the district court's decision to deny leave to amend for an abuse of discretion. *Gentilello v. Rege*, 627 F.3d 540, 546 (5th Cir. 2010). "A decision to grant leave is within the discretion of the court, although if the court 'lacks a substantial reason to deny leave, its discretion is not broad enough to permit denial.'" *State of La. v. Litton Mortg. Co.*, 50 F.3d 1298, 1302–03 (5th Cir. 1995). Rule 15(a) of the Federal Rules of Civil Procedure provides a "strong presumption in favor of granting leave to amend," and "a district court may be reversed for failing to provide an adequate explanation for denying it." *Fin. Acquisition Partners, LP v. Blackwell*, 440 F.3d 278, 291 (5th Cir. 2006). "When the reason for the denial is readily apparent, however, a district court's failure to explain adequately the basis for its denial is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." *Mayeaux v. La. Health Serv. and Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (citations and internal quotation marks omitted).

We are unable to conclude that the grounds for denying the Sierra Club's motion for leave to amend are ample or obvious. "Denial of leave to amend may be warranted for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of a proposed amendment." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010). None of these reasons for denial is apparent from the record.

Although the district court may have erred in denying Appellants leave to amend, or at least erred in failing to provide its reason for doing so, any error was harmless. *See* Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."). Appellants assert that their rights were affected because the district court's denial of leave to amend prevented them from addressing inadequacies in the Re-evaluation. On the contrary, the district court never

17

prohibited the parties from addressing the Re-evaluation. Furthermore, most of the additional claims in the proposed amended complaint were duplicative of the claims asserted in the original complaint. The relief sought by Appellants in the original complaint included the preparation of a supplemental EIS, and the Agencies concluded in the Re-evaluation that a supplemental EIS was unnecessary; therefore, the Re-evaluation was relevant to and appropriately addressed as part of Appellants' claims based on the FEIS. Two of the claims based on the Re-evaluation did not mirror claims in the original complaint, but one claim could have been brought in the original complaint and the other was fully addressed by the parties in their summary judgment briefing as part of one of the original claims. Appellants are therefore unable to demonstrate that their substantial rights were affected by the district court's denial of leave to amend their complaint.

## **CONCLUSION**

For the foregoing reasons, the judgment of the district court is AFFIRMED.